1 | Evan Livingstone, SBN 252008
ATTORNEY AT LAW
2 | 740 4th St., Suite 215
Santa Rosa, CA 95404
3 | Tel (707) 206-6570
Fax (707) 676-9112
4 | Email: evanmlivingstone@gmail.com

5 | Attorney for Plaintiffs Joseph Cream, Jr.

6

7

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | Joseph Cream, Jr., Amanda Cream, | Civil Action No. CV 15-
Cathy Cream and Fernando Carillo

11 | Plaintiffs | **COMPLAINT AND DEMAND FOR JURY TRIAL**

12 | vs. | RICO, 18 U.S.C. §1962
Electronic Funds Transfer Act, 15 U.S.C §1693
13 | Fair Debt Collection Practices Act, 15 U.S.C. §1692
Fraud
14 | Northern Leasing Systems, Inc, Lease | Negligent Misrepresentation
Finance Group LLC, EVO Merchant | Concealment
Services, LLC, EVO Payments
15 | International, LLC, Allen & | Breach of the Implied Covenant of Good Faith and Fair
Associates, Lease Source Inc., Lease | Dealing
16 | Source-LSI, LLC, CIT Financial USA, | Breach of Contract
Inc, Jay Cohen, Peter S Cohen, Ron G | Money Had and Received
17 | Arrington and Does 1-100 | Unjust Enrichment
Unfair Competition Law (B&P Code § 17000 et seq.)
18 | Defendants | False Advertising Law (B&P Code § 17500 et seq.)

19

20 | **COMPLAINT**

21 | COMES NOW PLAINTIFFS JOSEPH CREAM, JR. and alleges as follows:

22 | **I. INTRODUCTION**

23 | Plaintiffs assert a racketeering scheme to fraudulently entrap small businessmen like him

24 | into equipment leases with undisclosed charges and onerous terms. Defendants, through their

own representatives or third party salesman, deceptively sold these leases to Plaintiffs through what appeared to be a standard-form one-page lease, complete with signatures, and a personal guaranty ("Lease and Personal Guaranty"). Thereafter, Defendants (through the corporate Defendant) routinely charged and collected much more than what is specified in the first page, and foisted several other liabilities on the unsuspecting Plaintiffs. When questioned, Defendants finally revealed the existence of three additional pages which make the Lease and Personal Guaranty irrevocable, onerous, and virtually indefinite. Routinely, these pages and their contents were never disclosed to the Plaintiffs at the inception, and are not incorporated into the Lease and Personal Guaranty. Nevertheless, Defendants saddled Plaintiffs with all these terms and enforced them strictly.

On these and related grounds, Plaintiffs assert claims under the federal racketeering statute, 18 U.S.C. §1962, the Electronic Funds Transfer Act, 15 U.S.C §1693, the Fair Debt Collection Practices Act, 15 U.S.C. §1692, Fraud, Negligent Misrepresentation, Concealment, Breach of the Implied Covenant of Good Faith and Fair Dealing, Breach of Contract, Money Had and Received, Unjust Enrichment, California Unfair Competition Law (Business & Professions Code § 17000 et seq.) and California False Advertising Law (Business & Professions Code § 17500 et seq.), and seek equitable and injunctive relief, and compensatory, treble and/or punitive damages, together with attorneys' fees and expenses.

## II. JURISDICTION AND VENUE

Jurisdiction of this Court arises under 28 U.S.C. §1337, and supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. §1367. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202 and California B&P Code 1700 et seq.

Venue in the Northern District of California is proper pursuant to Title 28, United States Code, section 1391(b), and in the Oakland or San Francisco Division pursuant to Local Rule 3-

1    2(d), because Defendants transact business in Sonoma County California and the conduct

2    complained of occurred there.

3                                    **III. PARTIES**

4            Plaintiffs Joseph Cream, Jr. is a natural person residing in Sonoma County, California.

5            Defendant Northern Leasing Systems, Inc., is a New York corporation with its registered

6    offices at 333 Seventh Avenue, New York, New York 10001, and principal executive offices at

7    132 West 31 Street, 14th Floor, New York, NY 10001. Northern Leasing is a micro-ticket

8    leasing company located in New York City that claims to specialize in financing credit card

9    point of sale (POS) terminals and other business equipment. Defendant is regularly engaged in

10   the business of selling leases and collecting debts in the State of California.

11           Defendant Lease Finance Group LLC., is a Delaware Limited Liability Company. Its

12   registered agent is CT Corporation System, 111 Eighth Avenue, New York, New York 10011.

13   Lease Finance Group, LLC is a micro-ticket leasing company located in New York City that

14   claims to specialize in financing credit card point of sale (POS) terminals and other business

15   equipment. Defendant is regularly engaged in the business of selling leases and collecting debts

16   in the State of California.

17           Defendant EVO Merchant Services, LLC. is a Delaware limited liability company with

18   its registered offices at 515 Broadhollow Rd, Melville, NY 11747. EVO Merchant Services,

19   LLC. is a micro-ticket leasing company located in Melville, New York that claims to specialize

20   in financing credit card point of sale (POS) terminals and other business equipment. Defendant is

21   regularly engaged in the business of selling leases and collecting debts in the State of California.

22           Defendant EVO Payments International, LLC. is a Delaware limited liability company

23   with its registered offices at 515 Broadhollow Rd, Melville, NY 11747. EVO Payments

24   International, LLC is a micro-ticket leasing company located in Melville, New York that claims

1   to specialize in financing credit card point of sale (POS) terminals and other business equipment.

2   Defendant is regularly engaged in the business of selling leases and collecting debts in the State

3   of California.

4        Defendant Allen & Associates, is a company of unknown form of organization with its

5   offices at 147 Willis Avenue, Mineola, NY 11501. Defendant is regularly engaged in the

6   business of collecting debts in the State of California.

7        Defendant Lease Source  Inc is on information and belief a corporation of jurisdiction

8   unknown that is regularly engaged in the business of selling leases and collecting debts in the

9   State of California.

10       Defendant Lease Source-LSI, LLC is a New York limited liability company with its

11   registered agent for service of process offices at Moses & Singer LLP, Attn: Arnold N. Bressler,

12   Esq., 405 Lexington Ave, New York, NY 10174-1299. Lease Source-LSI, LLC is a micro-ticket

13   leasing company located in New York City that claims to specialize in financing credit card

14   point of sale (POS) terminals and other business equipment. Defendant is regularly engaged in

15   the business of selling leases and collecting debts in the State of California.

16       Defendant CIT Financial USA, Inc. is a Delaware corporation with its registered offices

17   at 1 CIT Dr., Livingston, NY 07030. CIT Financial USA, Inc. is a micro-ticket leasing company

18   located in New York City that claims to specialize in financing credit card point of sale (POS)

19   terminals and other business equipment. Defendant is regularly engaged in the business of selling

20   leases and collecting debts in the State of California.

21       Defendant Jay Cohen is and has been at all relevant times the President of the Defendant

22   Northern Leasing. Plaintiffs is informed and believes and thereon alleges that at all times herein

23   mentioned, Defendant Jay Cohen was and now is the agent, servant, employee, representative

24   and/or alter ego of each of the remaining Defendants and, in doing the things hereinafter

1  mentioned, was acting within the scope of his authority as such agent, servant, employee and/or

2  representative with the permission and consent of the remaining Defendants.

3      Defendant Ron G Arrington is and has been at all relevant times the President of the

4  Defendant CIT Financial USA, Inc. Plaintiffs is informed and believes and thereon alleges that at

5  all times herein mentioned, Defendant Ron G Arrington was and now is the agent, servant,

6  employee, representative and/or alter ego of each of the remaining Defendants and, in doing the

7  things hereinafter mentioned, was acting within the scope of his authority as such agent, servant,

8  employee and/or representative with the permission and consent of the remaining Defendants.

9      Defendant Peter S Cohen is and has been at all relevant times the President of the

10  Defendant EVO Payments International, LLC and EVO Merchant Services, LLC. Plaintiffs is

11  informed and believes and thereon alleges that at all times herein mentioned, Defendant RPeter S

12  Cohen was and now is the agent, servant, employee, representative and/or alter ego of each of

13  the remaining Defendants and, in doing the things hereinafter mentioned, was acting within the

14  scope of his authority as such agent, servant, employee and/or representative with the permission

15  and consent of the remaining Defendants.

16      Plaintiffs is presently unaware of the true names and capacities, whether individual,

17  associate, corporate, or otherwise of Defendants Does 1 through 100, or any of them, and

18  therefore sues such Defendants by such fictitious names. Plaintiffs will seek leave to amend this

19  Complaint to show the true names and capacities of such fictitiously named Defendants when the

20  same have been ascertained. Plaintiffs is informed and believes and thereon alleges that each of

21  the Defendants designated herein as a DOE is legally responsible in some manner for the acts,

22  omissions, and events alleged herein, and has proximately caused damages and injury to

23  Plaintiffs as herein alleged.

24

1

## IV. FACTS GIVING RISE TO THIS COMPLAINT

2

General Allegations

3       Defendants claim to be in the business of financing equipment for small businesses

4   through so called "equipment finance lease" contracts, the Lease and Personal Guaranty.

5   Typically, these transactions involve point-of-sale credit card swiping machines that typically

6   have a retail value of less than $500.

7       Defendants designed and perpetrated, and continue to perpetrate, a fraudulent scheme to

8   defraud Plaintiffs by willfully misrepresenting or concealing, and/or orchestrating the

9   misrepresentation or concealment of the true value of the point-of-sale credit card machines

10  being leased as well as terms of the lease Defendants induced Plaintiffs to sign through their

11  misrepresentation and/or concealment of the value of the equipment and terms of the lease.

12      At the time Defendants induced Plaintiffs into signing the lease, Defendants through their

13  sales representatives orally represented the terms of the lease to be 2 years at the end of which

14  time the equipment would be owned by Plaintiffs. In addition Defendants failed to provide

15  Plaintiffs with three of the four pages of the standard form Lease and Personal Guaranty which

16  contain highly onerous terms. Also Defendants charged and collected significantly higher

17  amounts than those represented to Plaintiffs.

18      Defendants, through their own representatives or third party salesmen, approached

19  Plaintiffs about leasing small business equipment. After making a successful sales pitch, these

20  salesmen obtained Plaintiffs' signatures, with personal guarantees, on the Lease and Personal

21  Guaranty which has been drafted and prepared by Defendants.

22      To facilitate this fraudulent scheme, Defendants drafted the Lease and Personal Guaranty

23  such that Plaintiffs have to sign on the very first page of the Lease and Personal Guaranty. Since

24  the signature of parties to a document are usually at the end of the document, Plaintiffs was led

to believe that the Lease and Personal Guaranty is a one page document containing all the terms of the lease.

Consistent with this fraudulent scheme, Defendants' representatives who sold Defendants' Lease and Personal Guaranties to Plaintiffs never discussed, mentioned, or even referred to the remaining three pages. No copy of the Lease And Personal Guaranty was ever left with Plaintiffs at the time of signing; instead, the salesman told Plaintiffs that Defendants would mail him a copy.

Defendants are of this routine concealment of 3 of the 4 pages of the Lease And Personal Guaranty. Defendants are also aware that their salesmen routinely do not give a copy of the Lease to Plaintiffs. Thus, the first page of the Lease was the only one seen by Plaintiffs. Accordingly, the terms contained in the remaining 3 pages cannot be said to have been agreed to by the Plaintiffs. They are not incorporated into the Lease and Personal Guaranty, they appear after the signatures of Plaintiffs, and hence, may not be enforced against them.

In the aforesaid manner, Defendants' salesmen fraudulently sold Plaintiffs an alleged lease for extortionately overpriced items at extremely onerous terms. These machines are typically available in the market for outright purchase, free and clear, at a fraction of the price of Defendants' "lease" prices. Worse, Defendants routinely charged significantly higher prices than those specified in the first page of the lease. When challenged, Defendants refer to provisions in the hitherto undisclosed three pages.

By routinely concealing the additional pages of the Lease and Personal Guaranty, Defendants willfully caused, enabled, permitted, and encouraged its salesmen to misrepresent the terms and effects of the lease, and the obligations being personally guaranteed by the Plaintiffs. Such salesmen routinely gave an innocuous picture of the Lease and Personal Guaranty, pointing to the only page disclosed to the Plaintiffs and not saying one word about the grossly inequitable

1   and oppressive terms therein. Defendants then disclaimed all such representations at lease

2   inception, and pointed to the merger clause in the undisclosed pages; this enabled Defendants'

3   salesmen to make misrepresentations with abandon – anything to clinch the sale.

4          Defendants and their salesmen failed to disclose to Plaintiffs the harsh terms of the

5   transaction contained in the three undisclosed pages. Thus, Defendants concealed from Plaintiffs

6   that the Lease and Personal Guaranty entitled Defendants to charge sums which were

7   significantly higher than those specified in the first page and that the automatic electronic

8   deductions from Plaintiffs' bank accounts, and Plaintiffs' other lease obligations, would continue

9   not for two years, but for a lease four years and indefinitely unless Plaintiffs gave specific

10  advance 60-day notice of cancellation and returned all the equipment which Defendant

11  represented Plaintiffs would own after two years. Additional terms of the missing three pages of

12  the lease which Defendants concealed from Plaintiffs were that the Lease and Personal Guaranty

13  purport to immunize Defendant from any warranties for the equipment; that although Defendants

14  retained title to the equipment leased, it was not answerable for failure or malfunction of the

15  equipment; that Plaintiffs' obligation to pay Defendants was absolute and based solely on

16  acceptance of the item leased; that the Plaintiffs had insurance obligations to Defendant with

17  respect to the equipment leased; that in case of an alleged default, Defendant could "without

18  demand or legal process enter into the premises where the equipment may be found and take

19  possession of and remove the equipment without liability for such retaking;" that the charges for

20  late payment of monthly dues were an extortionate 15%, with a minimum of five dollars; that in

21  case of litigation, the Plaintiffs was obligated to pay Defendant's attorney's fees and expenses

22  but Defendant had no such obligation even if the Plaintiffs prevailed; that any litigation would be

23  in a forum far away from Plaintiffs' homes and which forum was chosen and could be changed

24  by Defendant or its successor-in-title to the Lease and Personal Guaranty; and that Defendant –

1    but not the Plaintiffs – could effect service of process for a legal proceeding by certified mail,

2    return receipt requested.

3          Defendants' reasons for concealment of these terms is obvious: Plaintiffs would not have

4    agreed to the transaction if he knew of these terms.

5          Moreover, the Lease and Personal Guaranty does not require Defendant to proceed

6    against the business first in the event of default. In fact, Defendants proceeded against the

7    guarantor personally, not against the business which is usually the primary lessee.

8          Defendants' approach to collection has been aggressive. They have used the undisclosed

9    provisions described above to the fullest extent possible to obtain payment from Plaintiffs,

10   including dunning them with collection letters, and threatening to obtain judgments against those

11   who refuse to pay.

12         Defendants' representatives uniformly intimidated Plaintiffs with phone calls, and

13   expressly told Plaintiffs that it would be more expensive for Plaintiffs to litigate Defendants'

14   claims in New York than it would be to pay off Defendants.

15         All of the Leases and Personal Guaranties were purportedly made with an California

16   resident (Plaintiffs) and an California entity (Cream's Dismantling, Inc.) as lessees, and entered

17   into in California for the conduct of business there, nevertheless contained a forum selection

18   clause specifying New York and permitting Defendants to change the forum unilaterally.

19                              Specific Allegations

20         Lease 231779 / 0918340: On our about June 16, 2005, Defendant CIT Financial USA and

21   EVO Lease Finance Group's salesman contacted Plaintiff Joseph Cream, Jr. and his company,

22   Cream's Dismantling Inc., and offered to lease Plaintiff a Nurit 3020 point-of-sale credit card

23   machine. Defendants' salesman represented the terms of the lease as being 24 months and that

24   the equipment would belong to Plaintiff and his company after that time. Defendants' salesman

1   obtained Plaintiff's signature on the first page of the Lease and Personal Guaranty on behalf of

2   himself and his business. Plaintiff did not receive a copy of that document, and was unaware of

3   the existence of the additional three pages, or of the onerous terms contained therein.

4         Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

5   only 24 months, the actual lease provided for a 48 payments at $99.99 per month, for a total of

6   $4,799.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff

7   for $4,799.52 was available for outright purchase for less than $500. The lease also provided that

8   the equipment remained the property of Defendants and provided that tax and insurance could be

9   charged to Plaintiffs in an amount not specified.

10        Defendants commenced take automatic debits out of Plaintiff's bank account in an

11  unknown amount per month, which amount was considerably higher than the amount specified

12  in the lease. In approximately March 2011, Plaintiff realized the nature of Defendants' fraudulent

13  misrepresentation of the value of the equipment and terms of the lease. Thereupon, Plaintiff

14  stopped making payments and sought to return the equipment and sought to terminate the Lease

15  and Personal Guaranty.

16        Lease 1602302: On our about November 30, 2007, Defendant Lease Source LSI, LLC's

17  salesman contacted Plaintiff Cathy Cream and her company, All Trucks, and offered to lease

18  Plaintiff a Nurit 8320 point-of-sale credit card machine. Defendants' salesman represented the

19  terms of the lease as being 24 months and that the equipment would belong to Plaintiff and his

20  company after that time. Defendants' salesman obtained a signature on the first page of the Lease

21  and Personal Guaranty which does not appear to belong to Plaintiffs. Plaintiff did not receive a

22  copy of that document, and was unaware of the existence of the additional three pages, or of the

23  onerous terms contained therein.

24        Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

only 24 months, the actual lease provided for a 48 payments at $79.99 per month, for a total of $3,839.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff for $3,839.52 was available for outright purchase for less than $500. The lease also provided that the equipment remained the property of Defendants and provided that tax and insurance could be charged to Plaintiffs in an amount not specified.

Defendants commenced take automatic debits out of Plaintiff's bank account in an amount of $92.34 lease payment, plus a $5.00 "invoice service charge, which was significantly higher than the amount specified in the lease in the lease. Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00 for a "tax processing fee", $53.21 for "prop tax". When Plaintiff realized the nature of Defendants' fraudulent misrepresentation of the value of the equipment and terms of the lease, Plaintiff stopped making payments and sought to return the equipment and sought to terminate the Lease and Personal Guaranty.

Lease 1687926: On our about October 9, 2008, Defendant Lease Source LSI, LLC's salesman contacted Plaintiff Cathy Cream and her company, All Trucks, and offered to lease Plaintiff a Nurit 8000 point-of-sale credit card machine. Defendants' salesman represented the terms of the lease as being 24 months and that the equipment would belong to Plaintiff and his company after that time. Defendants' salesman obtained a signature on the first page of the Lease and Personal Guaranty which does not appear to belong to Plaintiffs. Plaintiff did not receive a copy of that document, and was unaware of the existence of the additional three pages, or of the onerous terms contained therein.

Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for only 24 months, the actual lease provided for a 48 payments at $99.99 per month, for a total of $4,799.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff for $4,799.52 was available for outright purchase for less than $500. The lease also provided that

the equipment remained the property of Defendants and provided that tax and insurance could be charged to Plaintiffs in an amount not specified.

Defendants commenced take automatic debits out of Plaintiff's bank account in of $114.19, plus a $5.00 invoice service charge, which was significantly higher than the amount specified in the lease in the lease. Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00 for a "tax processing fee", $53.53 for "prop tax". When Plaintiff realized the nature of Defendants' fraudulent misrepresentation of the value of the equipment and terms of the lease, Plaintiff stopped making payments and sought to return the equipment and sought to terminate the Lease and Personal Guaranty.

Defendant Lease Source LSI, LLC thereafter sent Plaintiff Cathy cream numerous dunning letters and demands for payment. Defendant threatened to initiate a civil action against Plaintiff. On September 13, 2011, Defendant retained an attorney who sent Plaintiff on unfiled copy of Verified Complaint, implying that a lawsuit had been filed against Plaintiff.

Plaintiff Cathy Cream on or about November 13, 2011, paid Defendant Northern Leasing Systems, Inc. $3,305 and Defendant Lease Source LSI, LLC $1,553 in order to resolve Defendants' fraudulent claims.

Lease 1695605A: On our about November 10, 2008, Defendant Lease Source LSI, LLC's salesman contacted Plaintiff Joseph Cream, Jr. and his company, Cream's Dismantling Inc., and offered to lease Plaintiff a Nurit 8000 point-of-sale credit card machine. Defendants' salesman represented the terms of the lease as being 24 months and that the equipment would belong to Plaintiff and his company after that time. Defendants' salesman obtained a signature on the first page of the Lease and Personal Guaranty which does not appear to belong to Plaintiffs. Plaintiff did not receive a copy of that document, and was unaware of the existence of the additional three pages, or of the onerous terms contained therein.

1    Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

2    only 24 months, the actual lease provided for a 48 payments at $99.99 per month, for a total of

3    $4,799.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff

4    for $4,799.52 was available for outright purchase for less than $500. The lease also provided that

5    the equipment remained the property of Defendants and provided that tax and insurance could be

6    charged to Plaintiffs in an amount not specified.

7    Defendants commenced take automatic debits out of Plaintiff's bank account in the

8    amount of $112.94 per month, which was about 13% higher than the amount specified in the

9    lease in the lease. Defendants also deducted additional amounts from Plaintiff's accounts in the

10   amount of $25.00 for a "tax processing fee", $34.54 for "prop tax" and $79.06 for "Int Rent." In

11   approximately March 2014, Plaintiff realized the nature of Defendants' fraudulent

12   misrepresentation of the value of the equipment and terms of the lease. Thereupon, Plaintiff

13   stopped making payments and sought to return the equipment and sought to terminate the Lease

14   and Personal Guaranty.

15   Lease 1725264A: On our about April 29, 2009, Defendant Lease Source LSI, LLC's

16   salesman contacted Plaintiff Joseph Cream, Jr. and his company, All Trucks, and offered to lease

17   Plaintiff a Nurit 8400 point-of-sale credit card machine. Defendants' salesman represented the

18   terms of the lease as being 24 months and that the equipment would belong to Plaintiff and his

19   company after that time. Defendants' salesman obtained a signature on the first page of the Lease

20   and Personal Guaranty on behalf of Plaintiffs and his business, however the signature does not

21   appear to be that of Plaintiffs. Plaintiff did not receive a copy of that document, and was unaware

22   of the existence of the additional three pages of the lease or of the onerous terms contained

23   therein.

24   Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

1    only 24 months, the actual lease provided for a 48 payments at $79.99 per month, for a total of

2    $3,839.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff

3    for $3,839.52 was available for outright purchase for less than $500. The lease also provided that

4    the equipment remained the property of Defendants and provided that tax and insurance could be

5    charged to Plaintiffs in an amount not specified.

6         Defendants commenced take automatic debits out of Plaintiff's bank account in the

7    amount of $92.34 per month which was 15% higher than the amount specified in the lease.

8    Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00

9    for a "tax processing fee", $27.63 for "prop tax" and $73.87 for "Int Rent." In approximately

10   March 2014, Plaintiff realized the nature of Defendants' fraudulent misrepresentation of the

11   value of the equipment and terms of the lease. Thereupon, Plaintiff stopped making payments

12   and sought to return the equipment and sought to terminate the Lease and Personal Guaranty.

13        Lease 1799108A: On our about August 3, 2010, Defendant Lease Finance Group LLC'

14   salesman contacted Plaintiff Joseph Cream, Jr. and his company, Cream's Dismantling Inc., and

15   offered to lease Plaintiff a Nurit 8400 point-of-sale credit card machine. Defendants' salesman

16   represented the terms of the lease as being 24 months and that the equipment would belong to

17   Plaintiff and his company after that time. Defendants' salesman obtained Plaintiff's signature on

18   the first page of the Lease and Personal Guaranty on behalf of himself and his business. Plaintiff

19   did not receive a copy of that document, and was unaware of the existence of the additional three

20   pages, or of the onerous terms contained therein.

21        Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

22   only 24 months, the actual lease provided for a 48 payments at $69.99 per month, for a total of

23   $3,359.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff

24   for $3,359.52 was available for outright purchase for less than $500. The lease also provided that

1  the equipment remained the property of Defendants and provided that tax and insurance could be
2  charged to Plaintiffs in an amount not specified.

3       Defendants commenced take automatic debits out of Plaintiff's bank account in the
4  amount of $81.41 per month which was 16% higher than the amount specified in the lease.
5  Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00
6  for a "tax processing fee", $1.59 for "prop tax" and $62.42 for "Int Rent." In approximately
7  March 2014, Plaintiff realized the nature of Defendants' fraudulent misrepresentation of the
8  value of the equipment and terms of the lease. Thereupon, Plaintiff stopped making payments
9  and sought to return the equipment and sought to terminate the Lease and Personal Guaranty.

10      Lease 1808377A: On our about October 7, 2010, Defendant Lease Finance Group LLC'
11  salesman contacted Plaintiff Joseph Cream, Jr. and his company, Cream's Dismantling Inc., and
12  offered to lease Plaintiff a Nurit 8020 point-of-sale credit card machine. Defendants' salesman
13  represented the terms of the lease as being 24 months and that the equipment would belong to
14  Plaintiff and his company after that time. Defendants' salesman obtained Plaintiff's signature on
15  the first page of the Lease and Personal Guaranty on behalf of himself and his business. Plaintiff
16  did not receive a copy of that document, and was unaware of the existence of the additional three
17  pages, or of the onerous terms contained therein.

18      Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for
19  only 24 months, the actual lease provided for a 48 payments at $79.99 per month, for a total of
20  $3,839.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff
21  for $3,839.52 was available for outright purchase for less than $500. The lease also provided that
22  the equipment remained the property of Defendants and provided that tax and insurance could be
23  charged to Plaintiffs in an amount not specified.

24      Defendants commenced take automatic debits out of Plaintiff's bank account in the

1  amount of $92.34 per month which was 15% higher than the amount specified in the lease.

2  Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00

3  for a "tax processing fee", $5.45 for "prop tax" and $55.40 for "Int Rent." In approximately

4  March 2014, Plaintiff realized the nature of Defendants' fraudulent misrepresentation of the

5  value of the equipment and terms of the lease. Thereupon, Plaintiff stopped making payments

6  and sought to return the equipment and sought to terminate the Lease and Personal Guaranty.

7          Lease 1809890A: On our about October 13, 2010, Defendant Lease Finance Group LLC'

8  salesman contacted Plaintiff Joseph Cream, Jr. and his company, Cream's Dismantling Inc., and

9  offered to lease Plaintiff two Nurit 8020 point-of-sale credit card machines. Defendants'

10  salesman represented the terms of the lease as being 24 months and that the equipment would

11  belong to Plaintiff and his company after that time. Defendants' salesman obtained Plaintiff's

12  signature on the first page of the Lease and Personal Guaranty on behalf of himself and his

13  business. Plaintiff did not receive a copy of that document, and was unaware of the existence of

14  the additional three pages, or of the onerous terms contained therein.

15          Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

16  only 24 months, the actual lease provided for a 48 payments at $139.99 per month, for a total of

17  $6,719.52. Unknown to Plaintiff, the point of sale credit card machines being leased to Plaintiff

18  for $6,719.52 was available for outright purchase for less than $500 each. The lease also

19  provided that the equipment remained the property of Defendants and provided that tax and

20  insurance could be charged to Plaintiffs in an amount not specified.

21          Defendants commenced take automatic debits out of Plaintiff's bank account in the

22  amount of $157.89 per month which was 13% higher than the amount specified in the lease.

23  Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00

24  for a "tax processing fee", $12.13 for "prop tax" and $31.58 for "Int Rent." In approximately

March 2014, Plaintiff realized the nature of Defendants' fraudulent misrepresentation of the value of the equipment and terms of the lease. Thereupon, Plaintiff stopped making payments and sought to return the equipment and sought to terminate the Lease and Personal Guaranty.

Lease 1814990: On our about November29, 2010, Defendant Northern Leasing Systems, Inc.'s salesman contacted Plaintiff Joseph Cream, Jr. and his company, All Star Auto Recycling Inc., and offered to lease Plaintiff a Nurit 8020 point-of-sale credit card machine. Defendants' salesman represented the terms of the lease as being 24 months and that the equipment would belong to Plaintiff and his company after that time. Defendants' salesman obtained Plaintiff's signature on the first page of the Lease and Personal Guaranty on behalf of himself and his business. Plaintiff did not receive a copy of that document, and was unaware of the existence of the additional three pages, or of the onerous terms contained therein.

Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for only 24 months, the actual lease provided for a 48 payments at $99.99 per month, for a total of $4,799.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff for $4,799.52 was available for outright purchase for less than $500. The lease also provided that the equipment remained the property of Defendants and provided that tax and insurance could be charged to Plaintiffs in an amount not specified.

Defendants commenced take automatic debits out of Plaintiff's bank account in the amount of $113.19 per month which was 13% higher than the amount specified in the lease. Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00 for a "tax processing fee", $5.70 for "prop tax" and $98.10 for "Int Rent." In approximately March 2014, Plaintiff realized the nature of Defendants' fraudulent misrepresentation of the value of the equipment and terms of the lease. Thereupon, Plaintiff stopped making payments and sought to return the equipment and sought to terminate the Lease and Personal Guaranty.

1    Lease 1838119: On our about May 26, 2011, Defendant Northern Leasing Systems, Inc.'s

2   salesman contacted Plaintiff Joseph Cream, Jr. and his company, Team Creams, and offered to

3   lease Plaintiff a Nurit 8400 point-of-sale credit card machine. Defendants' salesman represented

4   the terms of the lease as being 24 months and that the equipment would belong to Plaintiff and

5   his company after that time. Defendants' salesman obtained Plaintiff's signature on the first page

6   of the Lease and Personal Guaranty on behalf of himself and his business. Plaintiff did not

7   receive a copy of that document, and was unaware of the existence of the additional three pages,

8   or of the onerous terms contained therein.

9    Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

10  only 24 months, the actual lease provided for a 48 payments at $59.99 per month, for a total of

11  $2,879.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff

12  for $2,879.52 was available for outright purchase for less than $500. The lease also provided that

13  the equipment remained the property of Defendants and provided that tax and insurance could be

14  charged to Plaintiffs in an amount not specified.

15   Defendants commenced take automatic debits out of Plaintiff's bank account in the

16  amount of $70.04 per month which was 17% higher than the amount specified in the lease.

17  Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00

18  for a "tax processing fee", $1.64 for "prop tax" and $69.74 for "Int Rent." In approximately

19  March 2014, Plaintiff realized the nature of Defendants' fraudulent misrepresentation of the

20  value of the equipment and terms of the lease. Thereupon, Plaintiff stopped making payments

21  and sought to return the equipment and sought to terminate the Lease and Personal Guaranty.

22   Lease 1841828A: On our about July 7, 2011, Defendant Lease Finance Group LLC's

23  salesman contacted Plaintiff Joseph Cream, Jr. and his company, Cream's Dismantling Inc., and

24  offered to lease Plaintiff a Nurit 8400 point-of-sale credit card machine. Defendants' salesman

1    represented the terms of the lease as being 24 months and that the equipment would belong to

2    Plaintiff and his company after that time. Defendants' salesman obtained Plaintiff's signature on

3    the first page of the Lease and Personal Guaranty on behalf of himself and his business. Plaintiff

4    did not receive a copy of that document, and was unaware of the existence of the additional three

5    pages, or of the onerous terms contained therein.

6          Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

7    only 24 months, the actual lease provided for a 48 payments at $59.99 per month, for a total of

8    $2,879.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff

9    for $2,879.52 was available for outright purchase for less than $500. The lease also provided that

10   the equipment remained the property of Defendants and provided that tax and insurance could be

11   charged to Plaintiffs in an amount not specified.

12         Defendants commenced take automatic debits out of Plaintiff's bank account in the

13   amount of $69.74 per month which was 16% higher than the amount specified in the lease.

14   Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00

15   for a "tax processing fee", $1.64 for "prop tax", $41.84 for "Int Rent", $20 for "NSF Fee" and $9

16   for "Late Charge." In approximately March 2014, Plaintiff realized the nature of Defendants'

17   fraudulent misrepresentation of the value of the equipment and terms of the lease. Thereupon,

18   Plaintiff stopped making payments and sought to return the equipment and sought to terminate

19   the Lease and Personal Guaranty.

20         Lease 1846812A: On our about July 14, 2011, Defendant Lease Finance Group LLC's

21   salesman contacted Plaintiff Joseph Cream, Jr. and his company, Cream's Dismantling Inc., and

22   offered to lease Plaintiff a Nurit 8020 point-of-sale credit card machine. Defendants' salesman

23   represented the terms of the lease as being 24 months and that the equipment would belong to

24   Plaintiff and his company after that time. Defendants' salesman obtained Plaintiff's signature on

1  the first page of the Lease and Personal Guaranty on behalf of himself and his business. Plaintiff

2  did not receive a copy of that document, and was unaware of the existence of the additional three

3  pages, or of the onerous terms contained therein.

4     Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

5  only 24 months, the actual lease provided for a 48 payments at $79.99 per month, for a total of

6  $3,839.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff

7  for $3,839.52 was available for outright purchase for less than $500. The lease also provided that

8  the equipment remained the property of Defendants and provided that tax and insurance could be

9  charged to Plaintiffs in an amount not specified.

10     Defendants commenced take automatic debits out of Plaintiff's bank account in the

11  amount of $91.34 per month which was 14% higher than the amount specified in the lease.

12  Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $25.00

13  for a "tax processing fee", $5.77 for "prop tax", $27.41 for "Int Rent", $20 for "NSF Fee" and

14  $12 for "Late Charge." In approximately March 2014, Plaintiff realized the nature of Defendants'

15  fraudulent misrepresentation of the value of the equipment and terms of the lease. Thereupon,

16  Plaintiff stopped making payments and sought to return the equipment and sought to terminate

17  the Lease and Personal Guaranty.

18     Lease 1878059A: On our about March 21, 2012, Defendant Northern Leasing Systems,

19  Inc.'s salesman contacted Plaintiff Joseph Cream, Jr. and his company, Cream's Towing, and

20  offered to lease Plaintiff a Nurit 8020 point-of-sale credit card machine. Defendants' salesman

21  represented the terms of the lease as being 24 months and that the equipment would belong to

22  Plaintiff and his company after that time. Defendants' salesman obtained Plaintiff's signature on

23  the first page of the Lease and Personal Guaranty on behalf of himself and his business. Plaintiff

24  did not receive a copy of that document, and was unaware of the existence of the additional three

1    pages, or of the onerous terms contained therein.

2          Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

3    only 24 months, the actual lease provided for a 48 payments at $99.99 per month, for a total of

4    $4,799.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff

5    for $4,799.52 was available for outright purchase for less than $500. The lease also provided that

6    the equipment remained the property of Defendants and provided that tax and insurance could be

7    charged to Plaintiffs in an amount not specified.

8          Defendants commenced take automatic debits out of Plaintiff's bank account in the

9    amount of $113.44 per month which was 13% higher than the amount specified in the lease.

10   Defendants also deducted additional amounts from Plaintiff's accounts in the amount of $50.00

11   for a "tax processing fee", $5.77 for "prop tax" and $98.32 for "Int Rent." In approximately

12   March 2014, Plaintiff realized the nature of Defendants' fraudulent misrepresentation of the

13   value of the equipment and terms of the lease. Thereupon, Plaintiff stopped making payments

14   and sought to return the equipment and sought to terminate the Lease and Personal Guaranty.

15         Lease 1899059: On our about September 24, 2012, Defendant Northern Leasing Systems,

16   Inc.'s salesman contacted Plaintiff Fernando Carillo and his company, Calistoga Towing and

17   Auto Repair, and offered to lease Plaintiff a Nurit 8020 point-of-sale credit card machine.

18   Defendants' salesman represented the terms of the lease as being 24 months and that the

19   equipment would belong to Plaintiff and his company after that time. Defendants' salesman

20   obtained Plaintiff's signature on the first page of the Lease and Personal Guaranty on behalf of

21   himself and his business. Plaintiff did not receive a copy of that document, and was unaware of

22   the existence of the additional three pages, or of the onerous terms contained therein.

23         Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

24   only 24 months, the actual lease provided for a 48 payments at $89.99 per month, for a total of

1    $4,312.52. Unknown to Plaintiff, the point of sale credit card machine being leased to Plaintiff

2    for $4,312.52 was available for outright purchase for less than $500. The lease also provided that

3    the equipment remained the property of Defendants and provided that tax and insurance could be

4    charged to Plaintiffs in an amount not specified.

5            Defendants commenced take automatic debits out of Plaintiff's bank account in the

6    amount according to proof which was significantly higher than the amount specified in the lease.

7    Defendants also deducted additional amounts from Plaintiff's accounts in the amount according

8    to proof." In approximately March 2014, Plaintiff realized the nature of Defendants' fraudulent

9    misrepresentation of the value of the equipment and terms of the lease. Thereupon, Plaintiff

10   stopped making payments and sought to return the equipment and sought to terminate the Lease

11   and Personal Guaranty.

12           Thereafter, Defendant sent Plaintiff many dunning letters and on October 20, 2014 filed a

13   lawsuit in New York County Civil Court. Plaintiff was unable to defend against this lawsuit

14   because of the great distance between New York and California, and was forced to enter into a

15   payment arrangement with Defendant.

16           On our about September 24, 2010, Defendants EVO Merchant Services, LLC and EVO

17   Payments International LLC's salesman contacted Plaintiff Amanda Cream and her company, All

18   Star Towing, and offered to lease Plaintiff a point-of-sale credit card machine. Defendants'

19   salesman represented the terms of the lease as being 24 months and that the equipment would

20   belong to Plaintiff and his company after that time. Defendants' salesman obtained Plaintiff's

21   signature on the first page of the Lease and Personal Guaranty on behalf of himself and his

22   business. Plaintiff did not receive a copy of that document, and was unaware of the existence of

23   the additional three pages, or of the onerous terms contained therein.

24           Despite the fact that Defendant's salesperson represented to Plaintiff that the lease was for

1    only 24 months, the actual lease provided for a 48 payments at an amount according to proof,

2    along with additional credit card processing charges. Unknown to Plaintiff, the point of sale

3    credit card machine being leased to Plaintiff was available for outright purchase for less than

4    $500. The lease also provided that the equipment remained the property of Defendants and

5    provided that tax and insurance could be charged to Plaintiffs in an amount not specified.

6         Defendants commenced take automatic debits out of Plaintiff's bank account in the

7    amount according to proof which was significantly higher than the amount specified in the lease.

8    Defendants also deducted additional amounts from Plaintiff's accounts in the amount according

9    to proof." In approximately March 2014, Plaintiff realized the nature of Defendants' fraudulent

10   misrepresentation of the value of the equipment and terms of the lease. Thereupon, Plaintiff

11   stopped making payments and sought to return the equipment and sought to terminate the Lease

12   and Personal Guaranty.

13        Thereafter, Defendant Allen & Associates sent Plaintiff a dunning letters on behalf of

14   Defendant EBL Payments International demanding payment of a balance due of $340.

15        On January 23, 2015, Plaintiff Amanda Cream and sent Defendant Allen & Associates a

16   check for $250 in full settlement of the demanded amount per on agreement with Defendant.

17        Despite the fact that this debt was paid, Defendant Allen & Associates continued to

18   report the debt as a charge-off on Plaintiff Amanda Cream's credit report. As a result of said

19   inaccurate reporting on Plaintiff's credit report, Plaintiff's credit score has been damaged and

20   plaintiff has been denied credit for unimportant business transaction, which may imperil the

21   well-being of her business and cause damages in an amount according to proof.

22        Despite the fact that this debt was paid, Defendant EVO Merchant Services, LLC has

23   continued to report the debt as being owed and a charge-off on Plaintiff Amanda Cream's credit

24   report. As a result of said inaccurate reporting on Plaintiff's credit report, Plaintiff's credit score

1 has been damaged and Plaintiff has been denied credit for unimportant business transaction,

2 which may imperil the well-being of her business and cause damages in an amount according to

3 proof.

4      Defendants demanded that Plaintiffs pay the entire sum due for the balance of the leases

5 in a lump sums as premature cancellation penalties. When Plaintiffs refused, Defendants

6 repeatedly threatened him with deceptive notices, and threatened to sue Plaintiffs in the Supreme

7 Court of the City of New York. Defendants continued with their dunning letters and collection

8 calls, demanding that Plaintiffs personally fulfill his guaranty and pay the entire sum demanded.

9 Defendants have threatened to commence a lawsuit and have threatened to recover outstanding

10 fees claimed to be owed, attorney's fees, and costs of court proceeding from Plaintiffs and have

11 reported said unlawful debts to credit reporting agencies as debts legally owed.

12      Plaintiffs sustained damages in the form of overdraft fees and as a result of Defendants

13 making unauthorized withdrawals from Plaintiffs' bank accounts.

14      As a result of Defendants unlawfully reporting to credit agencies that Plaintiff Joseph

15 Cream Jr. owed debts for the above fraudulent leases to Defendants, Plaintiff Joseph Cream Jr.

16 has sustained damage to his credit report which has forced him to pay more for credit than he

17 would have been required to pay had Defendants not falsely reported these debts as being owed

18 by Plaintiffs to Defendant. Plaintiff Joseph Cream Jr. sustained damages according to proof as a

19 result of having to pay higher interest rates and higher down-payments for purchases.

20      Also as a result of said inaccurate reporting on Plaintiff Joseph Cream Jr.'s credit report,

21 Plaintiff has been denied credit for unimportant business transaction, which may imperil the

22 well-being of his business and cause damages in an amount according to proof.

23                        **DEMAND FOR JURY TRIAL**

24      Plaintiffs demands a jury trial.

---

## CLAIMS FOR RELIEF

### Count I

(RICO, 18 U.S.C. §1962(c))

The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

The association of Defendants, salesmen and others whose identities are known only to Defendants at this time, (the "Conspirators") constituted an enterprise within the meaning of 18 U.S.C. §1961(c), which enterprise was engaged in, and whose activities affected, interstate and foreign commerce. This enterprise was continuous in that it lasted for more than two years, had an ascertainable structure, and was distinct from the predicate offenses alleged here.

Each Defendant is a person within the meaning of 18 U.S.C §1961(3) and separate from the enterprise.

Defendants participated, and conspired with others (including their attorneys and others whose identities are known only to Defendants at this time) to participate, in the affairs of the aforementioned enterprise through a pattern of racketeering activity, as more fully set forth below, an all in violation of 18 U.S.C. §§ 1962(c).

Mail Fraud, Violations of 18 U.S.C. §1341

Defendants and the other members of the enterprise, devised a scheme or artifice to defraud Plaintiffs for the purpose of obtaining money or property by means of false of fraudulent pretenses, representations, or promises, and for the purpose of executing such scheme or artifice or attempting so to do, placed or caused to be placed in post office(s) or authorized depository for mail, letters and/or packages to be sent or delivered by the Postal Service, and/or took or received therefrom, letters and/or packages, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it was directed to be delivered

1   by the addressee such letters and/or packages. Specifically,

2         On or about April 11, 2011, Defendant Lease Source Inc. sent a letter to Plaintiff Cathy

3   Cream  demanding payment of an alleged debt, which alleged debt was fraudulently alleged to

4   be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent misrepresentations and

5   unauthorized withdrawal or attempted withdrawal of funds from Plaintiffs' bank account.

6   Defendant sent said letter from New York, through the interstate mail, to Plaintiffs in California.

7         On or about April 11, 2011, Defendant Northern Leasing Systems, Inc. sent a letter to

8   Plaintiff Cathy Cream  demanding payment of an alleged debt, which alleged debt was

9   fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

10   misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

11   Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

12   to Plaintiffs in California.

13         On or about April 24, 2011, Defendant Lease Source Inc. sent a letter to Plaintiff Cathy

14   Cream  demanding payment of an alleged debt, which alleged debt was fraudulently alleged to

15   be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent misrepresentations and

16   unauthorized withdrawal or attempted withdrawal of funds from Plaintiffs' bank account.

17   Defendant sent said letter from New York, through the interstate mail, to Plaintiffs in California.

18         On or about April 24, 2011, Defendant Northern Leasing Systems, Inc. sent a letter to

19   Plaintiff Cathy Cream  demanding payment of an alleged debt, which alleged debt was

20   fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

21   misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

22   Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

23   to Plaintiffs in California.

24         On or about April 27, 2011, Defendant Lease Source Inc. sent a letter to Plaintiff Cathy

1  Cream demanding payment of an alleged debt, which alleged debt was fraudulently alleged to

2  be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent misrepresentations and

3  unauthorized withdrawal or attempted withdrawal of funds from Plaintiffs' bank account.

4  Defendant sent said letter from New York, through the interstate mail, to Plaintiffs in California.

5          On or about April 27, 2011, Defendant Northern Leasing Systems, Inc. sent a letter to

6  Plaintiff Cathy Cream demanding payment of an alleged debt, which alleged debt was

7  fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

8  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

9  Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

10  to Plaintiffs in California.

11          On or about June 3, 2011, Defendant Lease Source Inc. sent a letter to Plaintiff Cathy

12  Cream demanding payment of an alleged debt, which alleged debt was fraudulently alleged to

13  be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent misrepresentations and

14  unauthorized withdrawal or attempted withdrawal of funds from Plaintiffs' bank account.

15  Defendant sent said letter from New York, through the interstate mail, to Plaintiffs in California.

16          On or about June 3, 2011, Defendant Northern Leasing Systems, Inc. sent a letter to

17  Plaintiff Cathy Cream demanding payment of an alleged debt, which alleged debt was

18  fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

19  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

20  Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

21  to Plaintiffs in California.

22          On or about July 25, 2011, Defendant Lease Source Inc. sent a letter to Plaintiff Cathy

23  Cream demanding payment of an alleged debt, which alleged debt was fraudulently alleged to

24  be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent misrepresentations and

1   unauthorized withdrawal or attempted withdrawal of funds from Plaintiffs' bank account.

2   Defendant sent said letter from New York, through the interstate mail, to Plaintiffs in California.

3          On or about July 25, 2011, Defendant Northern Leasing Systems, Inc. sent a letter to

4   Plaintiff Cathy Cream  demanding payment of an alleged debt, which alleged debt was

5   fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

6   misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

7   Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

8   to Plaintiffs in California.

9          On or about September 1, 2011, Defendant Lease Source Inc. sent a letter to Plaintiff

10  Cathy Cream  demanding payment of an alleged debt, which alleged debt was fraudulently

11  alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

12  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

13  Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

14  to Plaintiffs in California.

15         On or about September 1, 2011, Defendant Northern Leasing Systems, Inc. sent a letter to

16  Plaintiff Cathy Cream  demanding payment of an alleged debt, which alleged debt was

17  fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

18  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

19  Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

20  to Plaintiffs in California.

21         On or about September 12, 2011, Defendant Lease Source Inc. sent a letter to Plaintiff

22  Cathy Cream  demanding payment of an alleged debt, which alleged debt was fraudulently

23  alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

24  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

1   Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

2   to Plaintiffs in California.

3          On or about September 12, 2011, Defendant Northern Leasing Systems, Inc. sent a letter

4   to Plaintiff Cathy Cream  demanding payment of an alleged debt, which alleged debt was

5   fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

6   misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

7   Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

8   to Plaintiffs in California.

9          On or about September 25, 2011, Defendant Lease Source Inc. sent a letter to Plaintiff

10  Cathy Cream  demanding payment of an alleged debt, which alleged debt was fraudulently

11  alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

12  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

13  Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

14  to Plaintiffs in California.

15         On or about September 25, 2011, Defendant Northern Leasing Systems, Inc. sent a letter

16  to Plaintiff Cathy Cream  demanding payment of an alleged debt, which alleged debt was

17  fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

18  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

19  Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

20  to Plaintiffs in California.

21         On or about October 3, 2013, Defendant Northern Leasing Systems, Inc. sent three letters

22  to Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

23  fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

24  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

1    Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

2    to Plaintiffs in California.

3            On or about October 9, 2013, Defendant Northern Leasing Systems, Inc. sent three letters

4    to Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

5    fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

6    misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

7    Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

8    to Plaintiffs in California.

9            On or about October 11, 2013, Defendant Northern Leasing Systems Inc. sent a letter to

10   Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

11   fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

12   misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

13   Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

14   to Plaintiffs in California.

15           On or about October 11, 2013, Defendant Lease Finance Group LLC. sent a letter to

16   Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

17   fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

18   misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

19   Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

20   to Plaintiffs in California.

21           On or about October 15, 2013, Defendant Lease Finance Group LLC. sent two letter to

22   Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

23   fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

24   misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

1   Plaintiffs' bank account. Defendant sent said letter from Illinois, through the interstate mail, to

2   Plaintiffs in California.

3         On or about October 16, 2013, Defendant Lease Finance Group LLC. sent a letter to

4   Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

5   fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

6   misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

7   Plaintiffs' bank account. Defendant sent said letter from Illinois, through the interstate mail, to

8   Plaintiffs in California.

9         On or about October 25, 2013, Defendant Lease Finance Group LLC. sent a three letters

10  to Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

11  fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

12  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

13  Plaintiffs' bank account. Defendant sent said letter from Illinois, through the interstate mail, to

14  Plaintiffs in California.

15        On or about October 15, 2013, Defendant Northern Leasing Systems, Inc. sent two letters

16  to Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

17  fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

18  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

19  Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

20  to Plaintiffs in California.

21        On or about October 28, 2013, Defendant Northern Leasing Systems, Inc. sent three

22  letters to Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

23  fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

24  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

1   Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

2   to Plaintiffs in California.

3        On or about November 1, 2013, Defendant Northern Leasing Systems, Inc. sent three

4   letters to Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

5   fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

6   misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

7   Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

8   to Plaintiffs in California.

9        On or about April 3, 2014, Defendant Northern Leasing Systems, Inc. sent a letter to

10  Plaintiff Joe Cream, Jr. demanding payment of an alleged debt, which alleged debt was

11  fraudulently alleged to be owed by Plaintiffs to Defendant as a result of Defendant's fraudulent

12  misrepresentations and unauthorized withdrawal or attempted withdrawal of funds from

13  Plaintiffs' bank account. Defendant sent said letter from New York, through the interstate mail,

14  to Plaintiffs in California.

15       Each Defendant and other participant in this enterprise knew, expected, and intended that

16  the facilities of interstate mail would be used in furtherance of the racketeering scheme, and that

17  such use was an essential part of the scheme.

18                          Wire Fraud, Violations of 18 U.S.C. §1343

19       Defendants and other members of the enterprise, having devices or intending to devise

20  the scheme or artifice to defraud, and/or for obtaining money or property by means of false or

21  fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by

22  means of wire communication in interstate commerce, sounds, phone calls and messages for the

23  purpose of executing such scheme or artifice.

24       Defendants and other members of the enterprise, willfully and with intent to mislead

1 Plaintiffs referred to above, including without limitation, the very existence of 3 additional pages

2 of the Lease and Personal Guaranty and/.or the terms contained therein.

3       The material misrepresentations were made by Conspirators to Plaintiffs in California.

4       Plaintiffs relied upon such information, and were unaware of the facts concealed by

5 Defendants. Plaintiffs' reliance was, under the circumstances, reasonable.

6 Pattern of Racketeering Activity

7       The aforesaid acts had the same or similar purposes, results, participants, victims, and/or

8 methods of commission, and were otherwise interrelated by distinguishing characteristics and

9 were not isolated events. The pattern of racketeering activity engaged in by Defendants consisted

10 of a scheme executed by the aforementioned conspirators from June 16, 2005, and continuing to

11 date, to mislead Plaintiffs and others into entering and continuing to enter into onerous leases

12 and/or to charge them sums significantly in excess of that specified in the lease, and/or to

13 personally guaranty performance thereunder. That pattern included multiple predicate acts of

14 mail fraud and wire fraud.

15       The racketeering acts identified hereinabove were related to one another and formed a

16 pattern of racketeering activity in that they: (a) were in a furtherance of a common goal,

17 including the goal of profiting illegally by improperly concealing material terms of the Lease and

18 Personal Guaranty; (b) used similar methods (c) had similar participants; and (d) had similar or

19 related victims.

20       Acts of racketeering activity extended over a substantial period of time from June 2005,

21 and continue to this day. They were sufficiently continuous to form a pattern of racketeering

22 activity.

23       Defendants participated in the scheme through themselves, and, in the case of Defendant,

24 its representatives, salesmen, employees and officers, and others whose identities are known only

1    to Defendants at this time. Defendants benefited enormously by the profits they made, and the

2    various fees derived through defrauding, bullying, and intimidating Plaintiffs. The Conspirators

3    knew, enabled, and actively participated in the racketeering scheme.

4           Defendants engaged in a pattern of racketeering activity consisting of wire and mail

5    fraud, aiding and abetting wire and mail fraud, and bank fraud. The predicate acts occurred over

6    a period of over 8 years. Defendants received income from these patterns in the form of

7    extortionate lease rentals, transaction fees and service charges to the accounts, interest, and late

8    fees, attorneys' fees and disbursements. Defendants disbursed these funds amongst themselves in

9    a manner known only to them.

10          Defendants' participation was critical to the racketeering scheme. They enabled,

11   conducted, maintained, aided, and abetted the racketeering scheme by:

12          a)      Drafting and preparing the Lease and Personal Guaranty document in a

13   misleading manner to convey that the entire document was a one-page document, and misleading

14   and/or orchestrating Plaintiffs to believe that the one page contained all the lease obligations;

15          b)      Supervising, conducting, and monitoring the conduct of the fraudulent scheme;

16          c)      Concealing the scheme, or, alternatively, consciously avoiding discovery of the

17   scheme;

18          d)      Encouraging third parties to participate in the fraudulent scheme;

19          e)      Willfully violating, or being recklessly indifferent to, mandatory requirements of

20   federal law and procedure concerning racketeering, debt collections, electronic debit of bank

21   accounts, mail fraud, wire fraud, and the common law of fraud;

22          f)      Willfully violating or being recklessly indifferent to their legal obligations to

23   verify the legality of the alleged Lease and Personal Guaranty to ensure that they were not

24   fraudulently procured; and

g)      Willfully violating or being recklessly indifferent to its legal obligations to conduct "due diligence" with respect to the accounts at issue.

The precise role played by each Defendant is known only to Defendants at this time. Such information, and evidence concerning their participation, is exclusively within the possession and knowledge of Defendants.

Plaintiffs have been injured in their business or property by reason of Defendants' violation of 18 U.S.C. §1962(c). As a direct and proximate result of these violations, Plaintiffs have been injured in that, inter alia, they paid sums they should never had paid, have been saddled with unwarranted liabilities, and have had to expend time and resources in responding to Defendants' dunning calls, threats, and/or lawsuit in New York. In addition, Plaintiffs' credit rating has also been adversely affected.

By reason of this violation of 18 U.S.C §1964(c), Plaintiffs are entitled to recover from Defendants three times their damages plus pre- and post- judgment interest, costs and attorneys' fees. In addition, Plaintiffs is also entitled to the equitable remedies of rescission, and injunctive and declaratory relief.

**Count II**

(Conspiracy - Violation of 18 U.S.C. §1962(d))

The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants at this time conspired to violate the provisions of 18 U.S.C. §1962(c) in that, beginning no later than June 2005 and continuing through today, they knowingly agreed and conspired to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above. The volume and frequency of the

transactions, and the continuance of the scheme at issue for over 8 years, could not have occurred without the consent and knowing connivance of Defendants and other Conspirators.

As part of and in furtherance of their conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that they were in furtherance of that pattern of racketeering activity. As part of and in furtherance of their conspiracy, each Defendant agreed to and did commit at least two predicate acts of racketeering.

Plaintiffs has been injured in business or property by reason of Defendants' violations of 18 U.S.C. §1962(d).

As a direct and proximate result of each Defendants' violations, Plaintiffs have been injured as aforesaid.

By reason of Defendants' violation of 18 U.S.C. §1964(d), Plaintiffs are entitled to three times their damages plus interest, costs and attorneys' fees. In addition, Plaintiffs is also entitled to the equitable remedies of rescission, and injunctive and declaratory relief.

**Count III**

(Excess Deductions, Electronic Funds Transfer Act, 15 U.S.C §1693)

The contents of the paragraphs hereinabove are reiterated.

Plaintiffs is a consumer under the Electronic Funds Transfer Act, 15 U.S.C. §1693a(5).

Defendant obtained preauthorization for a monthly electronic transfer of specified amounts, from a specific bank account of Plaintiffs.

Nevertheless, Defendant electronically deducted 13% to 16% higher than the authorized amounts, as described in detail above, which was much more than the specified amount.

Defendant deducted sums in excess of its preauthorization. The other Defendants knowingly and willfully encouraged, aided, and abetted Defendant's illegal acts. Thereby, Defendants violated The Electronic Funds Transfer Act, 15 U.S.C. §1693e, and regulations

1   promulgated thereunder, for which violation Defendants are liable to pay damages, including

2   attorneys' fees and costs, to Plaintiffs.

3       In addition, Plaintiffs is also entitled to the equitable remedies of rescission, and

4   injunctive and declaratory relief.

5   **Count IV**

6   (Failure to Provide Copy of Preauthorization,

7   The Electronic Funds Transfer Act, 15 U.S.C. §1693)

8   Plaintiffs reiterate the contents of the paragraphs hereinabove.

9       Defendant obtained preauthorization for a monthly electronic transfer from a specified

10  bank account of Plaintiffs.

11      Defendant was obligated to give a copy of the preauthorization to Plaintiffs, 15 U.S.C.

12  §1693e; Reg. E, 12 C.F.R. §205.10(b).

13      Defendant never gave a copy of Plaintiffs' preauthorization to him at the time it was

14  made. The other Defendants knowingly and willfully encouraged, aided, and abetted Defendant's

15  illegal acts. These actions were in violation of the Electronic Funds Transfer Act, 15 U.S.C

16  §1693e, and regulations promulgated thereunder, for which violation it is liable to pay damages,

17  including attorneys' fees and costs, to Plaintiffs.

18      In addition, Plaintiffs is also entitled to the equitable remedies of rescission, and

19  injunctive and declaratory relief.

20  **Count V**

21  (Illegal Omnibus preauthorization, Electronic Funds Transfer Act, 15 U.S.C. §1693)

22  Plaintiffs reiterate the contents of the paragraphs hereinabove.

23      Defendant obtained preauthorization for a monthly electronic transfer from a specified

24  bank account of Plaintiffs "to withdraw any amounts including any and all sales and property

1   taxes now due or hereinafter imposed owed by [Plaintiffs] . . . by initiating debit entrees to

2   [Plaintiffs'] account at the financial institution . . . indicated above or at such other bank has

3   [Plaintiffs] may from time to time use."

4     The Electronic Funds Transfer Act, 15 U.S.C. §1693e, requires that a preauthorization

5   may be only sought for a specific account from a specific financial institution.

6     Defendant's omnibus preauthorization for any and all accounts that Plaintiffs may use at

7   any time is in violation of The Electronic Funds Transfer Act, 15 U.S.C. §1693e, and regulations

8   promulgated thereunder, for which violation it is liable to pay damages, including attorneys' fees

9   and costs, to Plaintiffs.

10     In addition, Plaintiffs is also entitled to the equitable remedies or rescission, and

11   injunctive and declaratory relief.

12   **Count VI**

13   (Illegal Condition, Electronic Funds Transfer Act, 15 U.S.C. §1693)

14     Plaintiffs reiterate the contents of the paragraphs hereinabove.

15     Defendants conditioned the extension of credit to Plaintiffs upon his repayment by means

16   of preauthorized electronic transfers.

17     Thereby, Defendants violated The Electronic Funds Transfer Act, 15 U.S.C. §1693k, and

18   regulations promulgated thereunder, Reg. E, 12 C.F.R. §205.10(e)(1), for which violation they

19   are liable to pay damages, including attorneys' fees and costs, to Plaintiffs.

20     In addition, Plaintiffs is also entitled to the equitable remedies of rescission, and

21   injunctive and declaratory relief.

22   **Count VII**

23   (Failure to Notify Varying Deductions, Electronic Funds Transfer Act, 15 U.S.C. §1693)

24     Plaintiffs reiterate the contents of the paragraphs hereinabove.

1    Defendant obtained preauthorization for a monthly electronic transfer from a specified

2    bank account or Plaintiffs "to withdraw any amounts including any and all sales and property

3    taxes now due or hereinafter imposed or owed by [Plaintiffs] . . . by initiating debit entrees to

4    [Plaintiffs'] account . . ."

5    Thereunder, Defendant enabled itself to, and did, deduct varying amounts from Plaintiffs'

6    account every month.

7    The Electronic Funds Transfer Act, 15 U.S.C. §1693e, and the regulations promulgated

8    thereunder require Defendants to "send [Plaintiffs] written notice of the amount and date of the

9    transfer at least 10 days before the scheduled date of the transfer." Reg. E, 12 C.F.R.

10   §205.10(d)(1).

11   Defendant routinely does not provide any such notice prior to deduction.

12   Defendant's conduct is in violation of The Electronic Funds Transfer Act, 15 U.S.C.

13   §1693e, and regulations promulgated thereunder. The other Defendants knowingly and willfully

14   encouraged, aided, and abetted Defendant's illegal acts. Defendants are liable to pay damages,

15   including attorney's fees and costs, to Plaintiffs.

16   In addition, Plaintiffs is also entitled to the equitable remedies of rescission, and

17   injunctive and declaratory relief.

18   **Count VIII**

19   (Illegal Waiver, Electronic Funds Transfer Act, 15 U.S.C §1693)

20   Plaintiffs reiterate the contents of the paragraphs hereinabove.

21   Defendants insisted and obtained from Plaintiffs a purported waiver of several rights

22   including, without limitation, the right to jury trial, the right to sue at a forum of his choice, and

23   the rights specified above.

24   Thereby, Defendants violated The Electronic Funds Transfer Act, 15 U.S.C. §1693I, and

regulations promulgated thereunder, for which violation it is liable to pay damages, including

attorneys' fees and costs, to Plaintiffs.

In addition, Plaintiffs is also entitled to the equitable remedies of rescission, and

injunctive and declaratory relief.

**Count IX**

(Deceptive Notice, Fair Debt Collection Practices Act, 15 U.S.C. §1692)

Plaintiffs reiterate the contents of the paragraphs hereinabove.

Plaintiffs is a consumer under The Fair Debt Collection Practices Act, 15 U.S.C.

§1692(3).

Defendants are debt collectors under The Fair Debt Collection Practices Act, 15 U.S.C.

§1692(6), in that Defendants have collected and/or attempted to collect debts under names other

than the original lessor. Upon information and belief Plaintiffs asserts that Defendants acted as a

debt collector for another person, or entity whom are not related by common ownership or

affiliated by corporate control, and that said Defendants did not act as a debt collector only for

persons to whom it is so related or affiliated, and that the principal business of Defendants is the

collection of debts;

Plaintiffs was unaware of the above facts, and had to waste time, energy, and resources in

investigating and determining the phony nature of the Summons and the fact that Defendants had

not commenced any proceeding at all.

Moreover, Defendants used false representation or deceptive means to collect or attempt

to collect the debt from Plaintiffs.

Thereby, Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §1692e,

for which violation they are liable to pay damages, including attorneys' fees and costs, to

Plaintiffs.

1    In addition, Plaintiffs is also entitled to the equitable remedies of injunctive and

2  declaratory relief.

3                                    **Count X**

4                                     (Fraud)

5    Plaintiffs incorporates the contents of the paragraphs hereinabove.

6    Defendants conducted a fraudulent scheme to entrap Plaintiffs into highly overpriced

7  leases with extremely onerous terms. They willfully and knowingly made, or caused to be made,

8  affirmative misrepresentations of material facts in the furtherance of this scheme. They also

9  willfully and knowingly concealed material facts from Plaintiffs including the true value of the

10  leased equipment, and routinely failed to give Plaintiffs a copy of the lease or even real the

11  existence of more than the first page of the lease. Defendants knew of the falsity of the

12  misrepresentations at the time these misrepresentations were made. Defendants also knew the

13  material nature of the facts that they willfully concealed from Plaintiffs, and that Defendants

14  ought to have disclosed these facts at that time to the Plaintiffs. Defendants had superior

15  knowledge not available to Plaintiffs; as such, they had the duty to disclose the facts. Plaintiffs

16  relied upon Defendants' representations, and were unaware of the falsity or misleading nature of

17  the representations. Plaintiffs' reliance was reasonable under the circumstances. As a result of

18  such reliance, Plaintiffs sustained damages.

19    By engaging in the conduct described above, Defendants committed a fraud upon

20  Plaintiffs.

21    Moreover, Defendants' wanton conduct was systematic, in reckless disregard of their

22  statutory and other duties, tantamount to criminal indifference to civil obligations, and

23  unconscionable.

24    Defendants are therefore liable to pay Plaintiffs compensatory and punitive damages in

such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate. In addition, Plaintiffs is also entitled to the equitable remedies of rescission, and injunctive and declaratory relief.

## Count XI

### (Negligent Misrepresentation)

Plaintiffs incorporates the contents of the paragraphs hereinabove.

Defendants conducted a fraudulent scheme to entrap Plaintiffs into highly overpriced leases with extremely onerous terms. They made or caused to be made, affirmative misrepresentations of material facts in furtherance of this scheme. They also concealed material facts from Plaintiffs including the true value of the leased equipment, and routinely failed to give Plaintiffs a copy of the Lease and Personal Guaranty. Defendants ought to have known the falsity of the misrepresentations. Defendants had superior knowledge not available to Plaintiffs; as such, they had the duty to disclose the facts. Plaintiffs relied upon Defendants' representations, and were unaware of the falsity or misleading nature of the representations. Plaintiffs' reliance was reasonable under the circumstances. As a result of such reliance, Plaintiffs sustained damages.

By engaging in the conduct described above, Defendants committed the tort of negligent misrepresentation upon Plaintiffs and other Plaintiffs.

Defendants are therefore liable to pay Plaintiffs damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate. In addition, Plaintiffs is also entitled to the equitable remedies of rescission, and injunctive and declaratory relief.

## Count XII

### (Concealment)

Plaintiffs incorporates the contents of the paragraphs hereinabove.

1   Defendant concealed or suppressed a material fact in that Defendants' sales

2   representatives concealed the actual value of the leased equipment and the actual terms of the

3   lease.

4   Defendant was under a duty to disclose the fact to Plaintiffs;

5   Defendant intentionally concealed or suppressed the fact with the intent to defraud

6   Plaintiffs by inducing Plaintiffs to enter into a lease which was oppressive and onerous;

7   Plaintiffs was unaware of the concealed fact and would have acted differently with

8   knowledge of the concealed fact; and

9   Plaintiffs suffered damage as a result of the concealed fact.

10                                  **Count XIII**

11                    (Breach of Implied Covenant of Good Faith and Fair Dealing)

12   Plaintiffs incorporates the contents of the paragraphs hereinabove.

13   By its conduct aforesaid, Defendant breached the implied covenant of good faith and fair

14   dealing underlying the contracts at issue. As a result of such breach, Plaintiffs sustained

15   damages.

16   Defendant is therefore liable to pay Plaintiffs compensatory damages in such amount as

17   may be proven at trial, together with attorneys' fees and expenses and such other amounts as

18   may be appropriate. In addition, Plaintiffs is also entitled to the equitable remedies or rescission,

19   and injunctive and declaratory relief.

20                                  **Count XIV**

21                                (Breach of Contract)

22   Plaintiffs incorporates the contents of the paragraphs hereinabove.

23   By charging and collecting sums in excess of those specified in the first page of the Lease

24   and Personal Guaranty, and by imposing undisclosed amounts towards alleged taxes and

1  insurance coverage, Defendant breached the contracts at issue. As a result of such breach,

2  Plaintiffs sustained damages.

3       Defendant is therefore liable to pay Plaintiffs compensatory damages in such amount as

4  may be proven at trial, together with attorneys' fees and expenses and such other amounts as

5  may be appropriate. In addition, Plaintiffs is also entitled to the equitable remedies of rescission,

6  and injunctive and declaratory relief.

7                                    **Count XV**

8                          (Money Had and Received)

9       Plaintiffs reiterate the contents of the paragraphs hereinabove.

10       By the aforesaid unlawful acts, Defendant unlawfully billed and collected money that is

11  was not entitled to. It received money belonging to Plaintiffs. Defendant benefited from the

12  receipt of money, and under principles of equity and good conscience, it should not be permitted

13  to keep the money.

14       Defendant must not be permitted to take advantage of its own wrong and retain, collect,

15  or continue collecting such money.

16       Moreover, Defendant is liable to pay Plaintiffs compensatory and punitive damages in

17  such amount as may be proven at trial, together with attorneys' fees and expenses and such other

18  amounts as may be appropriate.

19                                    **Count XVI**

20                          (Unjust Enrichment)

21       Plaintiffs reiterate the contents of the paragraphs hereinabove.

22       By collecting the excessive charges aforesaid, Defendant benefited at the expense of

23  Plaintiffs. Equity and good conscience require that Defendant be ordered to repay these sums to

24  Plaintiffs towards restitution.

1    Defendant must not be permitted to take advantage of its own wrong and retain, collect,

2    or continue collecting these illegal charges hereon.

3    Moreover, Defendant is liable to pay Plaintiffs compensatory and punitive damages in

4    such amount as may be proven at trial, together with attorneys' fees and expenses and such other

5    amounts as may be appropriate.

6    **Count XVII**

7    (California Unfair Competition Law Business & Professions Code § 17000 et seq.)

8    Plaintiffs reiterate the contents of the paragraphs hereinabove.

9    California Business and Professions Code § 17203, provides any person who engages,

10   has engaged, or proposes to engage in unfair competition may be enjoined in any court of

11   competent jurisdiction; and the court may make such orders or judgments, including the

12   appointment of a receiver, as may be necessary to prevent the use or employment by any person

13   of any practice which constitutes unfair competition, or as may be necessary to restore to any

14   person in interest any money or property, real or personal, which may have been acquired by

15   means of such unfair competition.

16   Defendants engaged in unlawful, fraudulent and unfair business practices by

17   misrepresenting the character and length of the leases for the credit card machines leased to

18   Plaintiffs, misrepresenting the value of the credit card machines leased to Plaintiffs, collecting

19   fees and charges not authorized by Plaintiffs - all to Plaintiffs' detriment and financial loss. Said

20   contact was not only fraudulent and unfair but violated multiple statutes as set forth above.

21   As a direct, proximate, and foreseeable result of Defendant's wrongful conduct as alleged

22   above, Defendant business acts or practices have caused injury to Plaintiffs and the public; and

23   Plaintiffs is entitled to relief, including full restitution and/or disgorgement of all revenues,

24   earnings, profits, compensation, and benefits which may have been obtained by Defendants as a

1    result of such business acts or practices.

2        Plaintiffs is entitled to injunctive relief prohibiting Defendants from further harming

3    Plaintiffs' credit by making derogatory reports to the credit reporting agencies.

4                                    **Count XVIII**

5        (California False Advertising Law Business & Professions Code § 17500 et seq.)

6        Plaintiffs reiterate the contents of the paragraphs hereinabove.

7        Defendant through its agents and/or salespersons made a false or misleading statement in

8    California and intentionally disseminated those statements to the public in California by

9    representing that the leased equipment was worth an amount comparable to the amount of the

10   lease, that the lease would extend for 24 months and that the equipment would belong to Plaintiff

11   and his company after the 24 months.

12       The statement deceived and harmed the Plaintiffs in that Plaintiffs was induced into

13   signing a lease which required him to pay much more money for the leased equipment than it

14   was actually worth, which Plaintiffs actually did.

15                                  **PRAYER FOR RELIEF**

16       WHEREFORE, Plaintiffs demands judgment against Defendants on each Count

17   aforesaid:

18       a)    Declaring that every lease and financing agreement under Defendant's standard

19   form Lease and Personal Guaranty is voidable at the option of the Plaintiffs herein for fraud in

20   the inducement;

21       b)    Declaring that pages 2-4 of all leases under Defendant's standard form Lease and

22   Personal Guaranty are unenforceable against Plaintiffs;

23       c)    Ordering Defendants to refund to Plaintiffs all sums collected in excess of the

24   amount specified in the first page of the Lease and Personal Guaranty;

d)      For restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendant(s) as a result of such unlawful business acts or practices;

e)      For a civil penalty for each unlawful violation;

f)      For an award of special, compensatory, punitive, and/or treble damages to Plaintiffs in an amount not less than $100,000 and in such amount as may be determined after discovery and trial;

g)      For injunctive relief enjoining Defendants from making derogatory reports on Plaintiffs' credit report and mandating that all existing derogatory reports be corrected;

h)      For costs of suit incurred herein;

i)      For reasonable attorney's fees as allowed by statute;

j)      For such further and other relief as may be just and proper.

Dated: March 13, 2015                    /s/ Evan Livingstone
                                         Evan Livingstone
                                         Attorney for Plaintiffs